No. 17,567.

HEBEL ET AL *v*. SCHOOL DISTRICT R-1, JEFFERSON COUNTY,
COLORADO ET AL.
(279 P. [2d] 673)

Decided January 31, 1955.

Mr. ROBERT G. FLEMING, Mr. LYLE E. MILLER, for plaintiffs in error.

Mr. MYLES P. TALLMADGE, Mr. ROBERT C. TALLMADGE, for defendants in error.

*En Banc.*

MR. JUSTICE HOLLAND delivered the opinion of the Court.

School District R-1, Jefferson county, Colorado, was organized by virtue of an Act of the state legislature in 1949, known as "The School District Reorganization Act of 1949," being chapter 224, S. L. '49, in which provision is made for the election of a board of education for said district. The duly elected board of education, on the 11th day of September, 1952, adopted a resolution to submit to the qualified taxpaying electors of the district, the question of contracting a bonded indebtedness of the district in an amount not exceeding $10,000,000.00 for the purpose of erecting and furnishing school buildings and school grounds within and for the district, at a special election to be held on October 20, 1952. The notice of said election and the ballot used at the election contained the following statement: "Said bonds to be issued from time to time in such amounts as will be within the lawful debt limit of said district at the time of issuing the bonds." At the election 7,093 votes were cast for the bonds and 869 against.

The original Act provided a bonded indebtedness limit of five per cent of the assessed valuation of the taxable property in such district. The legislature, in 1951, amended this Act by providing that the school district debt limit shall be based on "the assessed value of the property in such district for the year next preceding the date of said bonds."

On December 29, 1952, the district issued Series A bonds dated October 1, 1952, in the principal sum of $4,200,000 of the authorized issue. The assessed valuation of the taxable property of the district for the year 1951 was $42,087,030. As provided by the original Act, the Board made application to the Colorado Tax Commission for permission to increase the bonded indebtedness of the district and to incur a bonded indebtedness of $4,200,000, which would not exceed the ten per cent limit, five per cent of which is allowed by the Act, and upon showing by the Board of an existing emer-

gency, the tax commission was empowered to, and did, grant the additional five per cent.

On September 16, 1953, the Board adopted a resolution authorizing the issuance of Series B bonds in the principal sum of $3,300,00, dated August 1, 1953. Permission of the tax commission to increase the bonded indebtedness was again obtained. The assessed valuation of the taxable property for the year 1952 was $75,178,720; the outstanding in bonded indebtedness amounted to $7,500,000; and the bonds are in the hands of bona fide purchasers.

On the 10th day of August, 1954, the Board authorized the issuance of Series C building bonds in the principal sum of $734,000, dated July 1, 1954, and the permission of the tax commission again was obtained to increase the bonded indebtedness in the amount of $734,000. The assessed valuation of the taxable property of the district is $82,347,980, and it is alleged that if these latter bonds in the amount of $734,000 should be issued the district would have an outstanding bonded indebtedness of $8,234,000. It further is alleged that the Board has entered into a written contract for the sale of the latter bonds; that unless the Board is enjoined the bonds will be in the hands of bonda fide purchasers; and the taxpaying electors of the district will be estopped to deny the validity of said bonds.

About September, 1954, this action was commenced in the district court by a petition for declaratory judgment and an injunction, the petition setting out the facts hereinbefore generally enumerated, and containing a further allegation to the effect that the lawful limit of bonded indebtedness which the district could incur is to be determined by the assessed valuation of the taxable property of said district for the year 1951, which was the year previous to the adoption of the resolution on September 11, 1952, and the year prior to the issuance of the Series A bonds; that the Series A bonds and the Series B bonds, together with the proposed issue of the

Series C bonds, is an excess of the lawful debt limit of the district, and that if the latter issue is not enjoined the Board will cause an unlawful tax to be levied upon the petitioners' property; said petitioners allege that they are property owners and taxpaying electors of the district, and bring the action not only in their own behalf, but in behalf of all others similarly situated.

The prayer of the petition was for the declaration of the rights, status and legal relationship between petitioners and the Board, and for a determination by the court as to the time when the limit of bonded indebtedness of the district should be computed, whether at the time of the election at which bonds are authorized or the time when the bonds were actually issued.

To this petition for declaratory judgment and injunction, defendant school district and defendant members of the board of education of said district filed a motion to dismiss on the ground that the petition failed to state a claim upon which relief could be granted. The trial court sustained this motion and plaintiffs elected to stand upon the petition. Whereupon a declaratory judgment was entered by the court, denying the claims of plaintiffs for relief and declaring that the lawful limit of the bonded indebtedness of the defendant school district would not be exceeded by the issuance of the Series B bonds, and that plaintiffs had no right to the injunctive relief claimed; and further found that the limit of bonded indebtedness is to be determined by the assessed valuation of the taxable property at the time of the issuance or delivery of the bonds and not at the time or date of the election at which time bonds were authorized.

Counsel for plaintiffs contend that the limit of the bonded indebtedness of a school district must be determined by the board of education prior to a bond election; that the amount of the bonded indebtedness proposed may not exceed this limit; that the limit of the bonded indebtedness must be determined at the time of the election; and finally that if the time of the issuance of the

bonds is used as the date that the limitation is to be determined, the limit of indebtedness for all issues of bonds authorized at a similar election must be determined at the time of the issuance of the first series of bonds.

Counsel for the school district and the members of the board of education, defendants, argued that the legal limit is to be determined at the time of the issuance or delivery of the bonds and not at the time of the election; that the legal limit of the bonded indebtedness is determined by the applicable statute and not by the board of education; and that under the facts of this case the debt limit is to be computed at the time of the issuance of each series of bonds.

 The authorization of an issue of bonds is not the creation of an indebtedness, which can only arise when the bonds are issued; that the debt limit is determined at the time of the issuance of the bonds, whether issued in one or more series; and when the limitation is based on a percentage of the valuation, the limit of the debt is determined by the percentage of the assessed valuation in effect when the actual debt was created, which in this case, and under the pertinent statute, is the fixed percentage of the assessed valuation of the year next preceding *the date* of the bonds. If, as here, when the bonds are issued and become valid obligations in the hands of the purchasers, the bonds then issued do not raise the indebtedness above the legal limit established at that time according to statute, and will not be void because of the fact that at the time of the election authorizing the issue, the amount would have exceeded the then existing limit.

It seems to be conceded that the bonds issued in the instant case were within the debt limit at the time of their issuance, and that the last series will be within that limit when issued. It is provided in statutory procedure for the issuance of school bonds, that the amount of the bonded indebtedness proposed to be contracted,

and the maximum rate of interest that it is proposed the bonds will bear, is to be determined by the board of education prior to·the submission of the question of authorization to the electors. This is not, as counsel for plaintiffs contend, a requirement that the debt limit be fixed by the board; it is only a direction that the board of education decide upon or determine the amount proposed to be contracted. The limit for the indebtedness is fixed by the statute, which cannot be exceeded in any event. The fixing or the proposal of the amount is for a future indebtedness and not one as fixed or limited at the time of the calling of an election or of the date of the election. The statute requires that notice of the bond election shall state the amount of the bonded indebtedness proposed to be contracted; that the ballot to be used at the election contain a stated amount of the proposed indebtedness to be contracted; and further it is to be noted that in pursuance of the statutory direction the notice and the ballot here used stated that the bonds were to be issued from time to time in such amounts as would be within the lawful debt limit of the district at the time of the issuing of the bonds. Argument is not necessary to convince that this limit could vary from time to time as valuations might fluctuate, and it is a complete answer to the contention of counsel for plaintiffs, that the limit of all of the different series of bonds must be fixed as of the date of the first issuance, no series. The board, in arranging for an election and the time thereof, is not required to determine the date on which the bonds are to be issued. In the last analysis, the function of the board is to propose and suggest an amount; the electors determine whether the bonds shall be issued, and in the case before us, the electors from the ballot in their hands were informed that the bonds were to be issued from time to time within the then lawful limit. The arrangement and plan submitted to the electors was for future operation and it was proposed that an indebtedness was to be contracted and evidenced by bonds issued "from

time to time." "Time to time" could only be at such times when the property valuations of the year before would keep the issue within the statutory limit. Of course, the authorization when once adopted by the electors is not to be considered as an authorization for all future time, but only for such time as is reasonable, necessary or prudent.

■ There seems to be a little confusion or doubt as to the time of computation of the debt limit as it could arise, namely, whether in a case where bonds of a district organized under the 1949 Act were authorized and dated in 1954, after the 1954 valuation had been equalized, or whether the limit should be computed on the 1953 valuation, that being the year next preceding. It undoubtedly was the intent of the legislature that the debt limit be fixed on valuations nearest the date of the issuance of the bonds, therefore under the circumstances just mentioned, the limit should be fixed according to the most recent assessed valuation, that being the valuation of 1954 just prior to the issuance of the bonds. This illustration does not affect the issue before us; however, it is intended as a guide, if, as, and when, such a situation might arise.

The judgment of the trial court was correct and therefore it is affirmed.