**TOWN OF TELLURIDE,**
Petitioner–Appellee

v.

**SAN MIGUEL VALLEY CORPORATION,** a Colorado corporation; **Boomerang Holdings, LLC,** a Colorado limited liability company; **Alley Oop Holdings, LLC,** a Colorado limited liability company; **and Cordillera Corporation,** a Utah corporation, Respondents–Appellants.

No. 07SA101.

Supreme Court of Colorado,
En Banc.

June 2, 2008.

---

Faegre & Benson LLP, Leslie A. Fields, John R. Sperber, Denver, Colorado, Murray Dahl Kuechenmeister & Renaud LLP, Gerald E. Dahl, Denver, Colorado, Attorneys for Petitioner–Appellee.

Otten, Johnson, Robinson, Neff, & Ragonetti, P.C., Thomas J. Ragonetti, Darrell G. Waas, J. Thomas Macdonald, Patricia C. Campbell, Mikaela V. Rivera, Denver, Colorado, Attorneys for Respondents–Appellants.

Steven J. Zwick, County Attorney, Rebeckah S. King, Assistant County Attorney, Telluride, Colorado, Attorneys for Amicus Curiae The Board of County Commissioners of the County of San Miguel, Colorado.

Erin E. Goff, Denver, Colorado, Attorney for Amicus Curiae The Colorado Municipal League.

Grimshaw & Harring, P.C., Gilbert F. McNeish, Paul Wisor, Attorneys for Amicus Curiae The American Planning Association, Colorado Chapter.

Justice RICE delivered the Opinion of the Court.

This appeal raises the question whether section 38–1–101(4)(b), C.R.S. (2007) ("subsection 4b"), unconstitutionally denies home rule municipalities their eminent domain power under article XX of the Colorado Constitution. The Town of Telluride, a home rule municipality, sought to condemn 572 acres of real property located adjacent to Telluride for open space and park purposes. The owners of the property contested the condemnation, asserting that Telluride was barred from condemning the property by subsection 4b, which prohibits home rule municipalities from condemning property outside municipal boundaries for parks, recreation, open space, or other similar purposes. Today we affirm the decision of the San Miguel District Court that subsection 4b is an invalid abrogation of the eminent domain power granted to home rule municipalities by article XX of the Colorado Constitution.

## I. Facts and Procedural History

The Town of Telluride filed an eminent domain action in March 2004 in San Miguel County District Court against San Miguel Valley Corporation; Boomerang Holdings, LLC; Alley Oop Holdings, LLC; and Cordillera Corporation (collectively, "the Corporation") to acquire 572 acres of real property located adjacent to Telluride. Telluride sought to condemn this property, commonly known as the Valley Floor, for open space, parks, and recreation. The eminent domain

proceeding was set in motion by the citizens of Telluride, who for years have allocated twenty percent of the town's annual revenue to fund the acquisition of the Valley Floor, and who initiated and passed Ordinance 1174 to condemn the land. Ordinance 1174 declared that the town "has duly determined that it is of critical importance that it acquire [the Valley Floor] through eminent domain for public open space park purposes."

While the eminent domain action was pending, the Corporation lobbied the state legislature, which was at the time considering a bill that would limit the ability of municipalities to condemn property and transfer it into private ownership, to attach an amendment that would block Telluride's ability to condemn the Valley Floor. The Corporation's proposed amendment, eventually signed into law as subsection 4b of section 38–1–101, prohibits home rule municipalities such as Telluride from condemning property outside municipal boundaries for parks, recreation, open space, or other similar purposes. After the bill's passage, the Corporation filed a motion to dismiss Telluride's eminent domain action, asserting that pursuant to subsection 4b Telluride had no authority to proceed.

The trial court denied the Corporation's motion, ruling that subsection 4b constitutes an invalid abrogation of home rule municipalities' constitutional eminent domain power. The court set a valuation trial, and a jury awarded the Corporation $50 million in compensation for the property, a sum equal to the Corporation's own appraisal of the property's value. Telluride was then granted limited possession of the Valley Floor pending the outcome of this appeal. We review the judgment of the district court pursuant to our jurisdiction over cases in which a statute has been declared unconstitutional, as set forth in section 13–4–102(1)(b), C.R.S. (2007).

## II. Analysis

The Corporation asks us to review whether the trial court erred in holding that Telluride had the authority to condemn the Valley Floor under article XX of the Colorado Con-

stitution and that subsection 4b is an unconstitutional abrogation of that authority. We first review our cases examining the scope of the eminent domain power under article XX, reiterating that the constitution grants home rule municipalities the power to condemn property for any lawful, public, local, and municipal purpose. We next address whether the condemnation of property for parks and open space constitutes a lawful, public, local, and municipal purpose within the scope of article XX, concluding that it does. Finally, we examine the impact of subsection 4b on home rule municipalities' power of eminent domain. Because the General Assembly cannot deny home rule municipalities the eminent domain power conferred to them in the constitution, we hold that subsection 4b is unconstitutional with respect to home rule municipalities.[1] We thus conclude that Telluride's condemnation of the Corporation's property was lawful and affirm the judgment of the trial court.

## A. Scope of Article XX

The threshold question in this appeal is whether the condemnation of property for open space and park purposes falls within the scope of the eminent domain power granted to home rule municipalities in article XX of the Colorado Constitution. Telluride claims that, pursuant to article XX and its home rule charter, it is empowered to condemn the property in the Valley Floor for open space and park purposes. Telluride argues that because subsection 4b prohibits extraterritorial condemnations for open space or similar purposes, the statute represents an unconstitutional abrogation of home rule municipalities' eminent domain power. The Corporation counters that the constitution does not provide home rule municipalities with the authority to condemn extraterritorially for open space and park purposes, and that subsection 4b is carefully tailored not to interfere with powers granted by article XX. As both parties recognize, the General Assembly has no power to enact a law that denies a right specifically granted by the constitution. *City of Thornton v. Farmers*

---

1. Subsection 4b applies to both home rule and statutory municipalities. The constitutionality of subsection 4b with respect to statutory municipalities is not before the court.

*Reservoir & Irrigation Co.,* 194 Colo. 526, 534, 575 P.2d 382, 389 (1978). Therefore, the constitutionality of subsection 4b depends on whether article XX grants home rule municipalities the power to condemn property for open space and park purposes. We hold that it does.

Eminent domain is a sovereign power granted to home rule municipalities by article XX of the Colorado Constitution. Section 1 of article XX provides that a home rule municipality:

> shall have the power, within or without its territorial limits, to construct, condemn and purchase, purchase, acquire, lease, add to, maintain, conduct and operate water works, light plants, power plants, transportation systems, heating plants, and any other public utilities or works or ways local in use and extent, in whole or in part, and everything required therefore ... and ... the same or any part thereof may be purchased by said city and county which may enforce such purchase by proceedings at law as in taking land for public use by right of eminent domain.

Section 6 of article XX gives each home rule municipality all powers "necessary, requisite or proper for the government and administration of its local and municipal matters." These article XX powers are vested in municipalities through their home rule charters. Telluride's charter gives it the "full right of self-government on local and municipal matters," and further provides that the town has "the right of eminent domain to acquire property both within and without the boundaries of the Town for any purpose deemed by the Town council to be in the Town's best interest." Telluride, Colo., Home Rule Charter, §§ 14.1–14.2 (1997).

The Corporation first argues that the constitution does not provide Telluride authority to condemn extraterritorially for open space and parks because these are not purposes enumerated in article XX, section 1. The Corporation asserts that home rule municipalities can only condemn for purposes that either appear in section 1 or are correlative to the purposes listed in section 1. We disagree.

This court has held on multiple occasions that the purposes specified in section 1 are merely examples of a broader grant of power, namely the power to condemn property for any lawful, public, local, and municipal purpose. *City of Thornton,* 194 Colo. at 534, 575 P.2d at 389; *Toll v. City & County of Denver,* 139 Colo. 462, 468, 340 P.2d 862, 865 (1959); *Town of Glendale v. City & County of Denver,* 137 Colo. 188, 194, 322 P.2d 1053, 1057 (1958); *Fishel v. City & County of Denver,* 106 Colo. 576, 583, 108 P.2d 236, 240 (1940). For example, in *Fishel v. City & County of Denver,* Denver sought to condemn land outside city limits to be donated to the United States for an air corps technical school and bombing range. 106 Colo. at 578, 108 P.2d at 238. We rejected the argument that the condemnation power is limited to the purposes enumerated in section 1, stating:

> In view of the wide scope of such enumerated cases in which the power might be exercised—probably then considered as being all-inclusive—and the circumstance as we have so many times held, that this amendment was designed to give as large a measure of home rule in local municipal affairs as could be granted under a Republican form of government, we have no doubt that the people of Colorado intended to, and, in effect, did thereby delegate to Denver full power to exercise the right of eminent domain in the effectuation of any lawful, public, local, and municipal purpose.

Similarly, in *City & County of Denver v. Hallett,* we affirmed Denver's power to issue bonds to acquire property for a public auditorium. 34 Colo. 393, 398, 83 P. 1066, 1068 (1905). We acknowledged that the power to build a public auditorium was not specified in article XX, but held that "the statement contained in the first section was not intended to be an enumeration of powers conferred, but simply the expression of a few of the more prominent powers which municipal corporations are frequently granted." *Id.; see also Toll,* 139 Colo. at 469, 340 P.2d at 865 (holding that Denver had authority to condemn extraterritorially for flowage easements and channel improvements, though there is no mention of those purposes in article XX); *Town of Glendale,* 137 Colo. at 194, 322 P.2d

at 1056 ("Although sewers are not expressly mentioned in the Constitution, the powers enumerated therein are by way of illustration and not of limitation.").

Furthermore, a plain language reading of article XX, taken as a whole, confirms that the purposes enumerated in section 1 do not define the full scope of the eminent domain power. Section 1, which originally applied only to Denver, is made applicable to all home rule municipalities by article XX, section 6. Section 6 grants each home rule city and town "the powers set out in section 1, 4 and 5" of article XX, as well as "all other powers necessary, requisite or proper for the government and administration of its local and municipal matters. . . ." As we have held previously, this language establishes that the list of purposes in section 1 is not comprehensive. *Karsh v. City & County of Denver*, 176 Colo. 406, 411, 490 P.2d 936, 939 (1971).

In *Karsh v. City & County of Denver*, we examined whether Denver was authorized under article XX to issue bonds for the purpose of an urban renewal project, notwithstanding the fact that urban renewal is not a listed purpose in section 1. *Id.* We held that when section 6 was added to article XX in 1912, it "clearly expanded the purposes for which bonds might be issued." *Id.* We stated, "The enumerated purposes of section 1 were superseded by the general section 6 standard of 'local and municipal matters.'" Hence, in light of our caselaw and the plain language of article XX, we reject the Corporation's contention that Telluride's eminent domain power is limited to the purposes enumerated in section 1.

■ The Corporation next argues that the condemnation power under article XX is more limited in the context of an extraterritorial condemnation. The Corporation relies on language in section 6 which states that a home rule municipality's charter or local ordinance shall supersede state law within the territorial limits of the municipality. Because this language identifies a distinction between a home rule municipality's powers inside and outside of its jurisdiction, the Corporation asserts that a municipality's eminent domain powers should be construed narrowly when exercised extraterritorially and thus should be restricted to the list of purposes specified in section 1. We have not recognized a distinction between the scope of the extraterritorial and territorial eminent domain powers conferred in article XX, and we do not agree that the language in section 6 regarding supersession supports such a distinction.

The section 6 language cited by the Corporation establishes that home rule municipalities have plenary power over local and municipal matters within their territorial limits. However, we consider it a significant departure from the plain language of that provision—language constituting a grant of power—to infer that the provision contradicts or constrains extraterritorial powers independently established in a separate constitutional provision. We have affirmed extraterritorial condemnations in a number of cases and have not assigned an inferior status to the extraterritorial exercise of the condemnation power. *See, e.g., City of Thornton*, 194 Colo. at 535, 575 P.2d at 389 (holding that Thornton was authorized to condemn extraterritorially for water rights); *Toll*, 139 Colo. at 468, 340 P.2d at 865 (affirming extraterritorial condemnation for flowage easements and channel improvements); *City & County of Denver v. Bd. of Comm'rs*, 113 Colo. 150, 156, 156 P.2d 101, 103 (1945) (holding that Denver could condemn property for construction of airport more than five miles outside of city, despite five-mile limit in conflicting state statute); *Fishel*, 106 Colo. at 584, 108 P.2d at 241 (affirming extraterritorial condemnation for air corps school and bombing range).

In sum, we reiterate that the eminent domain power granted to home rule municipalities in article XX is not limited to the purposes enumerated in section 1, nor is the eminent domain power circumscribed when exercised extraterritorially. Rather, article XX grants home rule municipalities the power to condemn property, within or outside of territorial limits, for any lawful, public, local, and municipal purpose. Hence, we now examine whether the condemnation of property for open space and parks effectuates a lawful, public, local, and municipal purpose.

## B. Constitutional Validity of Extra-territorial Condemnation for Open Space and Parks

■ The question of whether the extraterritorial condemnation of property for open space and parks constitutes a lawful, public, local, and municipal purpose within the scope of article XX is a question of first impression for this court. Before we examine this question, however, we first address the Corporation's contention that the proper inquiry is whether the eminent domain power is being exercised pursuant to a "purely" local and municipal purpose. The Corporation concedes that the extraterritorial condemnation of property to create open space and parks constitutes a lawful, public purpose. However, the Corporation contends that this purpose is outside of the scope of article XX because it is not *purely* local and municipal. The Corporation would have us weigh the competing state and local concerns implicated by an extraterritorial condemnation for open space and park purposes. The Corporation would then have us hold that because such a condemnation implicates statewide concerns, it cannot constitute a local and municipal purpose within the meaning of article XX.

We decline to adopt this line of reasoning, as it conflates the matter of the scope of the article XX eminent domain power with the preemption analysis we use to determine the effect of a conflicting state statute on the acts of a home rule city. As we will discuss in part 2.C. below, a state statute may preempt a conflicting municipal act where sufficient statewide concerns are implicated. *See, e.g., Town of Telluride v. Lot Thirty–Four Venture*, 3 P.3d 30, 37 (Colo.2000); *City & County of Denver v. State*, 788 P.2d 764, 767 (Colo.1990). However, the weighing of competing state and local concerns is not necessary to construe the scope of the con-

demnation power in article XX, nor is it appropriate.

■ Article XX expressly authorizes home rule municipalities to condemn property outside of their territorial boundaries, necessarily implicating interests which are not "purely" local. Where the constitution specifically authorizes a municipal action which potentially implicates statewide concerns, the municipality's exercise of that prerogative is not outside the bounds of its authority. *Cf. Town of Frisco v. Baum*, 90 P.3d 845, 849 (Colo.2004) (holding that a municipality may exercise its jurisdiction to address local and municipal matters in municipal court—even though this exercise may affect the jurisdiction of the state's district courts and thus implicate a matter of statewide concern—because the constitution has specifically provided for such an outcome). We therefore conclude that the extraterritorial condemnation of property need not be pursuant to a purpose that is purely local and municipal. As long as the condemnation is based on a lawful, public, local, and municipal purpose, it cannot be said to fall outside of the scope of article XX merely because it potentially implicates competing state interests.

Hence, we return to the question of whether extraterritorial condemnation for open space and parks constitutes a lawful, public, local, and municipal purpose within the scope of article XX. Our past cases do not adopt a uniform standard for what constitutes a lawful, public, local, and municipal purpose, perhaps because of the difficulty of capturing the permissible range of local and municipal projects with a static test.[2] *Compare, e.g., McNichols v. City & County of Denver*, 101 Colo. 316, 324, 74 P.2d 99, 103 (1937) ("The test is whether the power, if exercised, will promote the general objects and purposes of the municipality."), *with City & County of Denver v. Sweet*, 138 Colo. 41, 49, 329 P.2d 441, 445 (1958) ("Whether a particular busi-

2. We previously observed the lack of a uniform approach in *McNichols v. City and County of Denver*, in which we stated:

The difficulty exists because of the necessary flexibility of the term itself, and because of everchanging ideas of the populace and constantly varying conditions of social as well as governmental life, it being abundantly demon-

strated that things are today looked upon as public or municipal projects which but a short time ago were not so regarded.

101 Colo. 316, 324, 74 P.2d 99, 103 (1937). We also noted in *McNichols* the tendency of the courts "not to unduly restrict municipalities in the exercise of their undertakings to promote the public welfare of their inhabitants." *Id.*

ness activity is a matter of municipal concern to a city under article XX depends upon the inherent nature of the activity and the impact or effect which it may have or may not have upon areas outside of the municipality."). Although we recognize the absence of a uniform standard to aid us in our determination, upon review of pertinent Colorado law, and considering our state tradition of conducting land planning at the local level, we conclude that condemnation for open space and parks is in fact a lawful, public, local, and municipal purpose within the scope of article XX.

Turning first to our review of pertinent Colorado law, we place reliance on the time-honored premise that article XX vests in home rule municipalities every power which the legislature "could have conferred." *Bd. Of Comm'rs,* 113 Colo. at 156, 156 P.2d at 103 ("If the General Assembly can confer a power upon any [statutory] city ... a charter city, such as Denver, already possesses the power without legislative action."). In past cases examining the constitutional validity of a home rule municipality's condemnation purpose, we have often inquired whether the legislature could have conferred upon the municipality the power to condemn for that purpose. *See, e.g.,* id.; *Fishel,* 106 Colo. at 584, 108 P.2d at 241; *Londoner v. City & County of Denver,* 52 Colo. 15, 23, 119 P. 156, 159 (1911); *Hallett,* 34 Colo. at 398, 83 P. at 1068. In this inquiry, we have considered statutes where the legislature has in fact conferred condemnation powers for the purpose in question. For example, in *Board of Commissioners,* we considered a statute that authorized municipalities to acquire and construct airports within five miles of their municipal boundaries to constitute evidence that extraterritorial condemnation for airports is a proper local and municipal purpose under article XX. 113 Colo. at 156, 156 P.2d at 103.

Applying the same inquiry, we find that the General Assembly has on multiple occasions conferred authority to statutory towns and cities to condemn land for parks, recreation, or open space. *See, e.g.,* § 29-7-104, –107, C.R.S. (2007) (granting municipal corporations the authority to condemn property for "park or recreational purposes or for the preservation or conservation of sites, scenes, open space and vistas"); § 32-1-1005(1)(c), C.R.S. (2007) (granting parks and recreational districts the power to condemn for access to "park and recreational facilities."). Two statutes specify that a condemnation for open space or parks can be extraterritorial. Section 31-25-201(1), C.R.S. (2007), grants cities the authority to condemn extraterritorially "as in the judgment of the governing body of such city may be necessary" for "park or recreational purposes," "parkways," and "open space" within five miles of a city's boundaries. Section 38-6-110, C.R.S. (2007), grants cities the authority to condemn for "park purposes" outside city boundaries, subject to section 31-25-201(1). In sum, the General Assembly's ability to confer upon municipalities the power to condemn for parks and open space is evidenced by the numerous statutes which in fact confer that power, thus confirming that parks and open space are lawful, public, local, and municipal purposes within the scope of article XX.

Second, we recognize that land use policy traditionally has been a local government function in the state, *see Town of Telluride,* 3 P.3d at 39 n. 9 (noting that land use is "traditionally regulated by local government"), and that Colorado municipalities are active in incorporating open space, parks, and recreation into their land planning. In addition to the statutory towns and cities that have acted to preserve open space pursuant to the statutes described above, many Colorado home rule municipalities of all sizes and geographies manage extensive open space programs.[3] More pertinent to the case at hand, a number of these home rule municipalities have seen fit to acquire open space outside their municipal boundaries.[4] Local planning for open space and park land acqui-

---

3. Amicus curiae, the Colorado Municipal League, cites Arvada, Aspen, Aurora, Boulder, Breckenridge, Castle Rock, Colorado Springs, Denver, Englewood, Frisco, Lafayette, Lakewood, Littleton, Louisville, Northglenn, Steamboat Springs, Thornton, and Westminster as examples.

4. Amicus curiae, the Colorado Municipal League, cites Arvada, Aurora, Boulder, Broomfield, Canon City, Castle Rock, Commerce City, Durango, Englewood, Evans, Glenwood Springs, Gunnison, Longmont, Loveland, Parker, Pueblo, Steamboat Springs, and Windsor as examples.

sition and development is a particularly important tool in the state's mountain resort communities, where unprecedented growth places pressure on the environmental qualities and recreational assets upon which these communities depend.[5] We conclude that municipalities, neighboring counties, and the state have traditionally acted on the presumption that land planning for open space and parks is a local government function.[6]

Based on the Colorado statutes that authorize statutory localities to condemn land for open space, parks, and recreation, as well as the traditional exercise of this power by the state's statutory and home rule municipalities, we hold that the extraterritorial condemnation of property for open space, parks, and recreation constitutes a lawful, public, local, and municipal purpose within the scope of article XX.[7]

## C. Constitutionality of Subsection 4b

■ Having determined that article XX grants home rule municipalities the power to condemn property extraterritorially for open space and park purposes, we now examine the impact of subsection 4b on that power. Because we conclude that subsection 4b abrogates constitutional powers granted to home rule municipalities by article XX, we hold that the statute is unconstitutional with respect to home rule municipalities.

Our inquiry into the constitutionality of subsection 4b need not extend beyond the question of whether the statute purports to deny home rule powers specifically granted by the constitution. *City of Thornton*, 575 P.2d at 389 ("The General Assembly has no power to enact any law that denies a right specifically granted by the Colorado Consti-

tution."). Nonetheless, the Corporation argues that, even if article XX grants home rule municipalities extraterritorial authority to condemn property for parks and open space, we must weigh competing state and local concerns implicated by the exercise of this authority to determine whether the authority can be preempted by the legislature. We disagree.

■ Although we recognize that the analysis of competing state and local concerns is appropriate in evaluating the preemptive effect of a statute on a municipal act, we dispute its relevance in the case at hand, which turns on the conflict between a statute and the state constitution. Our case law dictates that state statutes may preempt home rule municipalities' actions on matters of statewide or mixed state and local concern. In *Town of Telluride*, we held that if a home rule city enacts an ordinance concerning a matter of local concern and that ordinance conflicts with a state statute, the home rule ordinance takes precedence over the state statute. 3 P.3d at 37. If the matter is one of statewide or mixed state and local concern, we held that the state statute takes precedence over the conflicting home rule ordinance unless the ordinance is authorized by statute or by the constitution. *Id.* The Corporation urges us to utilize this framework in evaluating the validity of subsection 4b. However, no analysis of competing state and local interests is necessary where a statute purports to take away home rule powers granted by the constitution. *City of Thornton*, 194 Colo. at 536, 575 P.2d at 389; *Bd. Of Comm'rs*, 113 Colo. at 156, 156 P.2d at 102–03.

---

5. Between 1980 and 2005, Telluride's population increased over 223 percent, while the populations of Aspen, Steamboat Springs, Crested Butte, and Breckenridge increased 173 percent, 212 percent, 276 percent, and 410 percent, respectively. Colo. Dep't of Local Affairs, County and Municipal Population Estimates (2008), *available at* http://www.dola.state.co.us/demog_webapps/population_51festimate.

6. We find further support in the amicus brief filed by San Miguel County, which has jurisdiction over the Valley Floor. The county asserts that this condemnation is a local Telluride issue. We also note that the state Attorney General

declined to defend the constitutionality of subsection 4b, either at trial or in this appeal.

7. We accept as fact that Telluride sought the condemnation pursuant to this constitutionally valid purpose. The trial court rejected the contention that Telluride's purpose was disingenuous, a finding which the Corporation does not appeal. The Corporation argued at trial that Telluride's intent was to prevent proposed development of the Valley Floor, rather than the purposes stated in Ordinance 1174. The trial court found no evidence to support the contention that Telluride sought the condemnation in bad faith.

This precept is demonstrated in *City of Thornton,* in which Thornton sought to condemn extraterritorially under article XX for water rights in a nearby lake. 194 Colo. at 536, 575 P.2d at 389. Opponents of the condemnation argued that Thornton's constitutional condemnation powers were limited by the state Water Rights Condemnation Act of 1975. *Id.* at 531, 575 P.2d at 386. Among other provisions, this act required that a commission decide the "necessity" for condemning water rights and precluded the condemnation of water rights for future needs in excess of fifteen years. *Id.* at 532, 537, 575 P.2d at 387, 390. We declined to consider the opponents' arguments about the statewide interests that were purportedly at stake, stating:

> We fully recognize that ... in cases of conflict between a statute and the ordinance of a home rule city relating to a matter of statewide concern, the statute must govern. Here, however, there is involved a specific constitutional power granted to home rule municipalities and, even though the matter may be of statewide concern, the General Assembly has no power to enact any law that denies a right specifically granted by the Colorado Constitution.

*Id.* at 536, 575 P.2d at 389. Likewise, we decline here to evaluate the statewide interests implicated by the extraterritorial condemnation of property by home rule municipalities for open space and parks. The legislature cannot prohibit the exercise of constitutional home rule powers, regardless of the state interests which may be implicated by the exercise of those powers.[8]

The Corporation next argues that the General Assembly may abrogate home rule powers that are merely implied in the constitution. The Corporation maintains that, although the legislature cannot abrogate or override express provisions of article XX, there is no "express" authority in article XX for extraterritorial condemnation for open space and park purposes. According to the Corporation, powers of home rule municipalities that are merely implied from the constitution can apply only in matters which are purely local. Thus, unless the constitution "expressly" authorizes condemnations for open space and parks, the Corporation argues that this court must examine whether such condemnations implicate matters of local, statewide, or mixed concern in order to determine if the legislature can abrogate the implied condemnation authority.

■ We reject the notion that there are two separate echelons of condemnation powers under article XX—those express and those implied. The Corporation asks us to afford constitutional status only to those condemnation purposes enumerated in section 1 of article XX. However, as stated above, the purposes specified in section 1 are merely examples of a broader grant of power. Article XX grants home rule municipalities the power to condemn property, intra- or extraterritorially, for any lawful, public, local, and municipal purpose. This court has adhered to this construction of article XX in home rule cases stretching back over one hundred years. *See Hallett,* 34 Colo. at 398, 83 P. at 1068. The legislature cannot deny this constitutional condemnation power, even though its use may at times implicate statewide concerns. *See People v. Dist. Court,* 165 Colo. 253, 260, 439 P.2d 741, 745 (1968) ("The interpretation given by the courts to the constitution are [sic] incorporated in the instrument itself and are [sic] beyond the pow-

---

8. Our past cases indicate that, although the legislature may not *prohibit* the exercise of article XX powers, it may *regulate* the exercise of those powers in areas of statewide or mixed state and local concern. Therefore, the analysis of competing state and local interests would be appropriate in a case involving a statute which merely regulates home rule municipalities' exercise of their constitutional powers. For example, in *City of Commerce City v. State,* we held that the General Assembly could impose statewide procedures for the use of photo radar technology in traffic enforcement where there was a significant statewide interest in the uniform regulation of this technology. 40 P.3d 1273, 1284 (Colo. 2002). Similarly, in *City & County of Denver v. Board of County Commissioners,* this court affirmed county regulation of Denver water projects where the development of major new domestic water systems was held to be a matter of statewide concern. 782 P.2d 753, 762 (Colo. 1989). However, this line of cases does not compel us to analyze competing state and local concerns in the case at hand, where the legislature purports to abrogate, not regulate, home rule powers granted by the constitution.

er of the legislative branch of government to change."). We repeat our holding in *Town of Telluride,* where we stated, "If the matter is one of statewide or mixed state and local concern ... the state statute takes precedence over the conflicting local action *unless the action is authorized by statute or by the constitution."* 3 P.3d at 37 (emphasis added).

Subsection 4b prohibits home rule municipalities from condemning property for parks and open space, thus denying their constitutional power to condemn for any lawful, public, local, and municipal purpose. Subsection 4b provides in part:

> No home rule or statutory municipality shall ... acquire by condemnation property located outside of its territorial boundaries for the purpose of parks, recreation, open space, conservation, preservation of views or scenic vistas, or for similar purposes ... except where the municipality has obtained the consent of both the owner of the property to be acquired by condemnation and the governing body of the local government in which territorial boundaries the property is located.

Subsection 4b also provides that the only allowable extraterritorial condemnations are those for "water works, light plants, power plants, transportation systems, heating plants, any other public utilities or public works, or for any purposes necessary for such uses."

 ˙ Hence, subsection 4b curtails the condemnation power in article XX by limiting it to the enumerated purposes in section 1, and also by removing certain enumerated purposes from the list -namely condemnation for the purpose of "works or ways local in use and extent ... and everything required therefore." Accordingly, we conclude that subsection 4b is an unconstitutional abrogation of the powers granted to home rule municipalities under article XX. The General Assembly has no power to enact a law that denies a right specifically granted by the constitution. *City of Thornton,* 194 Colo. at 535, 575 P.2d at 389. The power of home rule municipalities to condemn for any lawful,

public, local, and municipal purpose can only be taken away by constitutional amendment. *See Four–County Metro. Improvement Dist. v. Bd. of Comm'rs,* 149 Colo. 284, 294, 369 P.2d 67, 72 (1962) (holding that constitutionally granted powers may be changed "only by constitutional amendment").

## III. Conclusion

Article XX grants home rule municipalities the power to condemn property for any lawful, public, local, and municipal purpose. We hold that the extraterritorial condemnation of property for open space and parks constitutes a lawful, public, local, and municipal purpose within the scope of article XX. Because subsection 4b purports to prohibit home rule municipalities, including Telluride, from exercising constitutional powers of eminent domain, we hold that the statute is unconstitutional. We thus conclude that the condemnation of the Corporation's property was lawful and affirm the judgment of the trial court.

Justice COATS specially concurs.

Justice EID dissents.

Justice COATS, specially concurring.

While I believe the litany of purposes in article XX, section 1,[9] for which home rule cities are empowered to "condemn and purchase," and especially its catch-all provision for "any other public utilities or works or ways local in use and extent," might at one time have been legitimately construed much more narrowly, I also believe that time has passed. I agree with the majority that longstanding precedents in this jurisdiction support its conclusion that the creation of open space is a lawful, public, local, and municipal purpose for which Telluride's right to condemn property, even outside its territorial boundaries, is constitutionally guaranteed. None of the parties has asked us to overturn any of those precedents.

I write separately merely to emphasize what I consider to be the import of footnote 8 of the court's opinion. As the court notes, our holding that the legislature cannot *pro-*

---

9. Colo. Const. art. XX, § 1.

*hibit* the exercise of constitutional home rule powers, regardless of shared state interests, does not suggest that the legislature cannot *regulate* the exercise of those powers. I understand the court's decision today to turn on the fact that section 38–1–101(4)(b), C.R.S. (2007), prohibits home rule cities from condemning property outside their territorial boundaries for open space, without the consent of the property owner. Rather than mere regulation, rationally related to shared state interests, this amounts to a complete abrogation of the right to condemn, the very essence of which is the right to take property without an owner's consent.

Article XX's grant of this power to home rule cities, however, does not purport to designate the exercise of the power to condemn *exclusively* a matter of local interest. As we have noted with regard to the power to legislate generally, certain matters that are of local concern, permitting a municipality to legislate, may also involve legitimate statewide concerns, permitting the state to legislate as well. *See City & County of Denver v. Qwest Corp.,* 18 P.3d 748, 754 (Colo.2001). While we have held it to be within the state's power to preempt a municipality's power to legislate in areas of mixed state and local concern, *see Bd. of County Comm'rs v. Bowen/Edwards Assocs., Inc.,* 830 P.2d 1045, 1056–57 (Colo.1992), we have also made clear that the state cannot completely abrogate a municipal power that exists through direct constitutional grant, rather than only indirectly, through the municipality's power to legislate. *See City & County of Denver v. Bd. of County Comm'rs,* 782 P.2d 753, 762 (Colo.1989) ("The powers granted to Denver in article XX, section 1, do not prevent [the General Assembly] from regulating the activities identified in that section.").

The distinction between regulating and actually prohibiting, although difficult to define with precision, is widely accepted. *See, e.g., 9 McQuillin Mun. Corp.* § 25:43 at 131–34 (3d ed. rev.2005). Although the power to regulate invariably entails a certain degree of prohibition, as long as legislative or administrative limitations are reasonably tailored to advance the public welfare and do not absolutely abrogate competing rights, some pro-

hibitory effect is tolerated as both necessary and acceptable, in a host of contexts. *See, e.g., Blue Sky Bar, Inc. v. Town of Stratford,* 203 Conn. 14, 523 A.2d 467, 471 (1987) ("Prohibition of an incident to or particular method of carrying on a business is not prohibition, but rather it is merely 'regulation'."). I believe the regulation/prohibition dichotomy provides the appropriate basis for challenges to the state's authority to infringe on powers directly granted to home rule cities by the state constitution.

It seems clear to me that the state has a cognizable interest in regulating the acquisition of property, beyond their own boundaries, by so many home rule cities. That interest, however, cannot permit the state legislature to absolutely prohibit the exercise of a constitutionally granted power. Because I believe section 38–1–101(4)(b) does precisely that, I concur in the majority's assessment that it cannot stand.

Justice EID, dissenting.

Today, the majority holds that the Colorado Constitution conveys to a home rule municipality the authority to condemn land outside its territorial boundaries for open space, striking down an act of the General Assembly that prohibits such condemnations. Because I believe our constitution does not convey to home rule municipalities such exclusive extraterritorial condemnation authority, I would uphold section 38–1–101(4)(b), C.R.S. (2007), against Telluride's constitutional challenge. I therefore respectfully dissent from the majority's opinion.

Section 1 of article XX of the Colorado Constitution, adopted in 1902, gives the City of Denver the authority to condemn land, "within or without its territorial limits," for the purpose of "water works, light plants, power plants, transportation systems, heating plants, and any other public utilities or works or ways local in use and extent." Section 6 of article XX, which was added in 1912, gives home rule municipalities the powers of section 1 and "all other powers necessary, requisite or proper for the government and administration of its local and municipal matters." In a number of cases, we have noted that condemnations by home rule municipali-

ties must be for a "local and municipal purpose." *See, e.g., Fishel v. City & County of Denver*, 106 Colo. 576, 583, 108 P.2d 236, 240 (1940) (stating that home rule municipalities have the power to condemn for "any lawful, public, local and municipal purpose").

Historically, however, we have been quite cautious with regard to condemnations that are extraterritorial in nature. Indeed, the extraterritorial uses we have found to be "local and municipal" in character have hewn closely to the purposes initially enumerated in article XX section 1. *See, e.g., City of Thornton v. Farmers Reservoir & Irrigation Co.*, 194 Colo. 526, 575 P.2d 382 (1978) (water rights for water project); *Toll v. City & County of Denver*, 139 Colo. 462, 340 P.2d 862 (1959) (flowage easements for sewer project); *City & County of Denver v. Bd. of Comm'rs*, 113 Colo. 150, 156 P.2d 101 (1945) (airport); *Fishel*, 106 Colo. 576, 108 P.2d 236 (air corps technical school and bombing field); *see also* maj. op. at 166 (citing the foregoing cases). Unlike the majority, I would continue our cautious stance towards extraterritorial condemnations in the case before us today.

In my view, our caution has been justified by article XX section 6 itself, which draws a distinction between territorial and extraterritorial actions taken by a municipality. It provides that ordinances passed by a home rule municipality's governing body "shall supersede *within the territorial limits* ... of said city or town any law of the state in conflict therewith." (Emphasis added). Thus, section 6 plainly states that a home rule municipality's ordinance, such as the one giving Telluride the authority to condemn land outside its boundaries for open space, can supersede conflicting state law—here, section 38–1–101(4)(b)—*only* within its own boundaries. By definition, an extraterritorial condemnation implicates land that may be located in a neighboring municipality—precisely the sort of subject matter that has traditionally concerned the General Assembly. *See generally* Howard C. Klemme, *The Powers of Home Rule Cities in Colorado*, 36 U. Colo. L.Rev. 321 (1963–64) (discussing the historical development of our home rule jurisprudence).

The majority glosses over section 6's clear limitation on extraterritorial actions by stating that we have permitted extraterritorial condemnations in the past. Maj. op. at 166. Yet again, these exterritorial condemnations have been few and far between, and have been closely related to the enumerated purposes in section 1. These narrow precedents hardly compel the conclusion reached by the majority today: that the General Assembly cannot limit a home rule municipality's extraterritorial condemnation authority to those purposes listed in article XX section 1.

Justice Coats' concurrence notwithstanding, the effect of today's ruling is to cut out the General Assembly from regulating extraterritorial condemnations. The majority holds that a home rule municipality has the constitutional authority to condemn property outside of its boundaries essentially for any valid purpose—a broad standard indeed. Maj. op. at 168–169. This holding necessarily prevents the General Assembly from prohibiting or substantially limiting such extraterritorial condemnations. While the General Assembly could, if it chose to do so, abrogate or modify section 38–1–101(4)(b), today's decision takes such an action out of its hands.

I agree with the majority and amici that open space is a vital resource that Colorado must protect. The question here, however, is whether our constitution gives home rule municipalities that *exclusive* authority, rendering section 38–1–101(4)(b) unconstitutional, with regard to extraterritorial condemnations. In my view, it does not. I therefore respectfully dissent.